16147

STATE v. CIESIELLSKI

(50 S. E. (2d) 194)

*Messrs. H. T. Abbott, Jr.,* of Conway, *and Claude M. Epps,* of Myrtle Beach, *for Appellant,*

*Mr. J. Reuben Long, Solicitor,* of Conway, *for Respondent,*

*Messrs. H. T. Abbott, Jr.,* of Conway, *and Claude M. Epps,* of Myrtle Beach, *for Appellant,*

November 11, 1948.

OXNER, Justice.

Richard L. Ciesiellski, Joe Williamson and Eddison Martin were jointly indicted and tried for the murder of Clayton Hall. All were found guilty of murder with recommendation to the mercy of the court and sentenced to imprisonment for life. Richard L. Ciesiellski alone has appealed.

The only questions to be determined are (1) whether the Court erred in refusing a motion by appellant for a directed verdict of acquittal made at the conclusion of all the testimony, and (2) whether there was error in failing to instruct the jury on the question of malice as an element of the offense of murder.

The deceased, Clayton Hall, operated a filling station at Cresent Beach in Horry County and lived on the second floor of the building. About 7 o'clock on Sunday morning, November 9, 1947, he was found dead lying on the ground, face downward, at a point about fifty or sixty feet from the filling station and near a pen in which he kept his hogs. His body was riddled with buckshot. He had on his work clothes.

The pockets of his trousers had been pulled out. Near his right hand there was an overturned slop bucket with most of the contents spilled. Both the filling station and the living quarters above had been ransacked. Behind a large sign located about thirty feet from where the body was lying there were imprints indicating that someone had recently knelt or sat on the ground. The general appearance of the place tended to show that the deceased was shot while on his way to feed his hogs and that the motive for killing was robbery or burglary.

The officers were promptly notified and commenced an investigation. Four or five days later appellant and Williamson were arrested at Norfolk, Virginia, and brought to the county jail at Conway where Martin had already been incarcerated. Shortly thereafter the officers obtained from all three of these men certain statements and admissions upon which the State principally relied on the trial of the case to connect them with the homicide. The evidence thus obtained was substantially as follows:

Appellant and Williamson, 19 and 39 years of age respectively, were employed as taxi drivers in Norfolk, Virginia. They worked for the same company and knew each other well. About ten days before the homicide they left Norfolk and drove in appellant's car to North Carolina where a day or two later they were joined by Martin, a boyhood friend of Williamson's. After remaining in North Carolina for several days, visiting various places and doing considerable drinking, on Tuesday preceding the homicide they drove to Crescent Beach where appellant and Martin spent three or four nights at a motor court located about a fourth of a mile from the filling station operated by the deceased. Williamson stayed there only a part of this time. He spent Wednesday and Thursday nights with the deceased whom he had known since childhood. During this visit the deceased exhibited to Williamson approximately $50,000.00 which he had in a cracker box. On Friday Williamson went

to Wilmington, North Carolina, where his wife and children were then living. On Saturday morning appellant and Martin also went to Wilmington where they again joined Williamson. Some time during that morning Williamson informed the other two of the large amount of money in the possession of the deceased. They then planned to feloniously take it. Appellant had a rifle in his possession. They traded the rifle for a shotgun, paying a difference of $3.00. One of the men purchased a box of buckshot and each fired the gun for the purpose of testing it. Some time late that afternoon or early that night they drove back to Crescent Beach and parked the car several hundred yards from the filling station operated by the deceased, where they slept until early the next (Sunday) morning. Martin and Williamson then left the car and proceeded toward the filling station. Appellant stated to the officers that he "stayed on the outside and watched". Williamson called on the deceased and was invited to breakfast. Martin remained outside behind the signboard heretofore mentioned. While breakfast was being prepared, the deceased left the filling station for the purpose of feeding his hogs and was shot and killed by Martin as he was walking toward the hog pen. Williamson had previously informed Martin that the deceased customarily fed his hogs about this time. After the shooting, appellant went to the filling station and joined Williamson. Apparently they did not get any money. It is not clear whether their search was unsuccessful or whether they had to make a hurried getaway on account of the approach of a car. In any event, all three men went back to the car and left. After proceeding a short distance they stopped and one of the men hid the gun. A little later a pistol taken from the filling station was thrown from the car. Martin had a wallet containing approximately $100.00, evidently taken from the person of the deceased. The wallet was thrown away and there is some conflict in the statements as to the division of the money. Martin got out of the car somewhere in North Carolina and appellant and Williamson drove to Norfolk.

Williamson stated to the officers that they didn't intend to kill any one but to "go there and get the money". He said that under the original plan Martin was to seize and tie both him and the deceased, take the money, leave with appellant, and he was to later join them.

After the homicide the officers found over $17,000.00 at the deceased's filling station.

Martin did not testify at the trial. The testimony of appellant and Williamson did not differ materially from the statements made to the officers. Appellant said that when the other two men first mentioned the fact that they had planned a robbery and needed his car, he informed them that he did not want to have anything to do with it but that after the two convinced him that "it would be easy", he finally acquiesced. He said that at the time of the shooting he was standing a hundred feet or more away from the filling station and had no idea that the plan contemplated killing anyone. The following is taken from his testimony:

"Q. In this robbery that had been suggested, what part were you to have in the robbery? A. I was supposed to drive the car, and if Martin called me, to get out and see what he wanted, but there was no definite part I was supposed to do, except to see what Martin wanted, if he called me."

In support of appellant's contention that the evidence is insufficient to sustain his conviction, his counsel contend that the crime was planned solely by Martin and Williamson; that appellant had no part in the conspiracy and did not know who had been selected as the proposed victim; that the taking of human life was never contemplated nor anticipated; and that at the time of the commission of the homicide, appellant was 75 or 100 feet away and did not aid or participate therein.

If several parties agree or conspire to commit a robbery or burglary, either of which is a felony, each party is criminally responsible for the acts of his

associates or confederates in furtherance or in prosecution of the common purpose for which they combine. "The common purpose may not have been to kill and murder, but if it was unlawful, as, for instance, to break in, and steal, and in the execution of this common purpose a homicide is committed by one, as a probable or natural consequence of the acts done in pursuance of the common design, then all present participating in the unlawful common design are as guilty as the slayer. But if.the killing has no connection with the common purpose, and did not ensue as a probable result of an attempt to execute it, then the slayer alone is responsible for the killing." *State v. Cannon,* 49 S. C. 550, 27 S. E. 526, 530. The test is whether the homicide was committed in furtherance of the plan and was a probable result of its execution. As stated in *State v. Williams,* 189 S. C. 19, 199 S. E. 906, 908: "There can be no doubt of the general rule of law that a person engaged in the commission of an unlawful act is legally responsible for all the consequences which naturally or necessarily flow from it, and that if he combines and confederates with others to accomplish an illegal purpose he is liable *criminaliter* for everything done by his confederates which follows incidentally in the execution of the common design, as one of its probable and natural consequences, even though what was done was not intended as a part of the original design or common plan." For a review of cases from other jurisdictions on the question of the responsibility of one participating in a burglary or robbery in the execution of which his companion commits murder, see annotations in 68 L. R. A. 193, 6 L. R. A., N. S., 1154; and 45 L. R. A., N. S. 55.

The undisputed evidence shows that appellant knew of the plan to secure money by felonious means and agreed to participate therein. His rifle was traded for a shotgun to be used, if necessary, in the undertaking and he agreed to furnish the car. His own evidence shows that he was constructively present and was engaged at the time of the homicide in performing his part in the felonious enter-

prise. The fact that he and his confederates did not contemplate taking human life does not relieve him of responsibility if the killing was done in furtherance of the plan and was a probable result of its execution. And there was sufficient evidence to reasonably warrant this conclusion. The motion for a directed verdict of acquittal was properly refused.

The remaining question relates to the charge. Appellant contends that the Court erred in failing to define malice in instructing the jury as to the elements of the offense of murder. The jury was given the usual and accepted definition of murder. Although the Court explained to the jury the meaning of "aforethought" as used in this definition, the Court did not define or state the legal meaning of "malice", or at least the definition given was incomplete. This omission would have constituted reversible error if the case had presented any of the elements of manslaughter, but there was no evidence warranting a verdict of manlsaughter and that question was properly not submitted to the jury. Under the evidence appellant was either guilty of murder or nothing. It follows that a definition of malice was not an essential part of the declaration of the law necessary to an understanding by the jury of the issues presented. The error complained of was not prejudicial. *State v. Du Rant,* 87 S. C. 532, 70 S. E. 306. Also see *Dye v. State,* 127 Miss. 492, 90 So. 180.

Appellant did not employ counsel. Counsel appearing for him were appointed by the Court and they have discharged their duty both in the Court below and on this appeal with commendable zeal and ability.

The judgment is affirmed.

BAKER, C.J., and FISHBURNE, STUKES and TAYLOR, JJ., concur.